**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DIANA MEIGHAN,** **ADMINISTRATRIX OF THE ESTATE OF** **MICHAEL BOCKIUS** **300 W ASHLAND AVENUE** **GLENOLDEN, PA 19036** | **CIVIL ACTION** |
| **Plaintiff** | |
| **Vs.** | **No.: 22-CV-5138** |
| **CITY OF PHILADELPHIA,** **POLICE COMMISSIONER** **DANIELLE OUTLAW** **P.O. TUCKER, BADGE NO. 2471** **P.O. CREELY, BADGE NO. 4780** **P.O. MCGRODY, BADGE NO. 3445** **CPL. JOHN DOE, BADGE NO. 8139** **P.O. GALAZKA, BADGE NO. 9337** **P.O. CLARK, BADGE NO. 9909** **SERGEANT/LIEUTENANT JOHN DOE 1-10** **POs JOHN DOE 1-10** | **JURY TRIAL DEMANDED** |
| **Defendants** | |

## ORDER

And now, this _____ day of _____, 2023, upon review of the

herein Unopposed Motion of Plaintiff, Diana Meighan, *et al.* it is hereby ordered that said

motion to amend the complaint is GRANTED. Plaintiff's Second Amended Complaint

attached to the within motion as Exhibit "A" is deemed file as of the day of this Order.

BY THE COURT:

_____
J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DIANA MEIGHAN,** <br> **ADMINISTRATRIX OF THE ESTATE OF** <br> **MICHAEL BOCKIUS** <br> **300 W ASHLAND AVENUE** <br> **GLENOLDEN, PA 19036** <br><br> **Plaintiff** <br><br> **Vs.** <br><br> **CITY OF PHILADELPHIA,** <br> **POLICE COMMISSIONER** <br> **DANIELLE OUTLAW** <br> **P.O. TUCKER, BADGE NO. 2471** <br> **P.O. CREELY, BADGE NO. 4780** <br> **P.O. MCGRODY, BADGE NO. 3445** <br> **CPL. JOHN DOE, BADGE NO. 8139** <br> **P.O. GALAZKA, BADGE NO. 9337** <br> **P.O. CLARK, BADGE NO. 9909** <br> **SERGEANT/LIEUTENANT JOHN DOE 1-10** <br> **POs JOHN DOE 1-10** <br><br> **Defendants** | **CIVIL ACTION** <br><br><br> **No.: 22-CV-5138** <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFFS' UNOPPOSED MOTION TO FILE AN AMENDED COMPLAINT**
**COMPLAINT PURSUANT TO FED.R.CIV.P. 15**

Plaintiffs, by their attorney, L. Kenneth Chotiner, LL.M., respectfully move this Court

for leave to file an amended complaint in this matter for the reasons set forth in the

accompanying memorandum of law.

Respectfully submitted,

Dated: July 7, 2023

L. KENNETH CHOTINER, LL.M.
Pennsylvania ID No. 77451
ABRAMSON & DENENBERG, P.C.
1315 Walnut Street | Suite 500
Philadelphia, PA 19107
(215) 398-7066
KChotiner@adlawfirm.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DIANA MEIGHAN,<br>ADMINISTRATRIX OF THE ESTATE OF<br>MICHAEL BOCKIUS<br>300 W ASHLAND AVENUE<br>GLENOLDEN, PA 19036** | **CIVIL ACTION** |
| **Plaintiff** | |
| **Vs.** | **No.: 22-CV-5138** |
| **CITY OF PHILADELPHIA,<br>POLICE COMMISSIONER<br>DANIELLE OUTLAW<br>P.O. TUCKER, BADGE NO. 2471<br>P.O. CREELY, BADGE NO. 4780<br>P.O. MCGRODY, BADGE NO. 3445<br>CPL. JOHN DOE, BADGE NO. 8139<br>P.O. GALAZKA, BADGE NO. 9337<br>P.O. CLARK, BADGE NO. 9909<br>SERGEANT/LIEUTENANT JOHN DOE 1-10<br>POs JOHN DOE 1-10** | **JURY TRIAL DEMANDED** |
| **Defendants** | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
UNOPPOSED MOTION TO FILE AN AMENDED COMPLAINT[1]
<u>PURSUANT TO FED.R.CIV.P. 15</u>**

Plaintiffs, by their attorney, L. Kenneth Chotiner, LL.M., respectfully move this Court
for leave to file an amended complaint in this matter for the reasons set forth in the below:

**Factual History.**

1.      By letter dated February 6, 2021, Plaintiffs' counsel provided defendant, the
City, with notice of this claim. (See Exhibit "B," a true and correct copy of the letter dated
February 6, 2021.)

2.      On December 23, 2022, Plaintiffs filed a complaint in this Court against the
City of Philadelphia, Police Commissioner Danielle outlaw, P.O. Tucker, P.O. Creely, P.O.

---

[1] By email dated June 28, 2023, defense counsel indicated that defendants will not oppose this motion. (A true
and correct copy of the email dated June 28, 2023, is attached as Exhibit "B.")

McGrody, Cpl. John Doe, P.O. Galazka, P.O. Clark, Sgt./Lt. John Doe 1-10, and P.O.s John

Doe 1-10, under 42 U.S.C. § 1983 and the Pennsylvania Wrongful Death and Survival Acts,

to redress the deprivation of the rights of decedent Michael Bockius and his heirs, for

defendants' deliberate indifference to his serious medical needs and his vulnerability to

suicide, that resulted in his suicide while in the custody of Philadelphia police on January 6,

2021.

3.      On January 17, 2023, Defendants filed a Motion to Dismiss for failure to state

a claim. On February 7, 2023, Plaintiffs filed an Amended Complaint. On February 21, 2023,

Defendants filed a Motion to Dismiss the Amended Complaint. On March 7, 2023, Plaintiffs

file a response in opposition.

4.      By Order dated March 30, 2023, the Court scheduled an Initial Pretrial

Conference for April 4, 2023, and required the parties to "make the required initial

disclosures at least one day prior to the" conference.

5.      Defendants did not produce their initial disclosures until April 26, 2023. *See*

email dated April 26, 2023, attached as Exhibit "C."

6.      By Order dated April 11, 2023, the Court denied Defendants' Motion to

Dismiss.

7.      On April 11, 2023, the Court issued a Scheduling Order that required, among

other things, the parties to file all motions to amend by April 24, 2023.

8.      By letter dated June 20, 2023, Plaintiffs' counsel requested defense counsel

to sign a stipulation to substitute/correct the names of the identified and John Doe

defendants. *See* letter dated June 20, 2023 attached as Exhibit "D."

9.      By email dated June 23, 2023, defense counsel stated that he could "not agree to the joinder of defendants that [he] do[es] not represent." (*See* Exhibit "E," a true and correct copy of the email dated June 23, 2023.)

10.     Defense counsel stated that plaintiffs' counsel will "have to file a motion with the court" even though the deadline for filing such a motion had passed. (*Id.* and Order dated April 11, 2023.)

11.     Even though the Court ordered deadline for filing such a motion has passed, Plaintiffs file the instant motion because it could not have been filed before the deadline because Plaintiff did not receive information regarding the identity of the individuals, which were contained in the defendants' initial disclosures, until after the deadline and the defendants do not oppose the motion. (*See* Exhibit "F.")

12.     Moreover, Plaintiffs wish to file a Second Amended Complaint, correcting the names of previously identified defendants and naming the John Doe defendants because of information learned for the first time as a result of receiving Defendants' initial disclosures.

**Standard of Review.**

This motion is governed by Federal Rule of Civil Procedure, 15, which provides in relevant part:

(a) Amendments Before Trial.

(1) Amending as a Matter of Course. A party may amend its pleading once as a matter of course within:

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(2) Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

(3) Time to Respond. Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to

respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

* * * *

(c) Relation Back of Amendments.

(1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:

    (A) the law that provides the applicable statute of limitations allows relation back;

    (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

    (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

        (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

        (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

**Argument.**

Plaintiffs exercised due diligence in attempting to obtain the identity of

Because Defendants did not produce their initial disclosureas as requiredPlaintiff

was

Respectfully submitted,

_____

Dated: July 7 2023

L. KENNETH CHOTINER, LL.M.
Pennsylvania ID No. 77451
ABRAMSON & DENENBERG, P.C.
1315 Walnut Street | Suite 500
Philadelphia, PA 19107
(215) 398-7066
KChotiner@adlawfirm.com

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DIANA MEIGHAN, ADMINISTRATRIX OF THE ESTATE OF MICHAEL BOCKIUS** | **CIVIL ACTION** |
| **Plaintiff** | |
| **Vs.** | **No.: 22-CV-5138** |
| **CITY OF PHILADELPHIA**, *et al.* | **JURY TRIAL DEMANDED** |
| **Defendants** | |

**CERTIFICATE OF SERVICE**

I, L. Kenneth Chotiner, hereby certify that the foregoing Unopposed Motion to Amended, has been filed electronically on the date below, and is available for viewing and downloading from the Court's Electronic Case Filing System ("ECF") and/or that I caused a true and correct copy of this document to be mailed on the date below, by first class mail, postage prepaid to the following:

Derek Kane, Esquire
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 14th Fl.
Philadelphia, PA 19102

July 7, 2023

Respectfully submitted,

L. KENNETH CHOTINER, LL.M.
Pennsylvania ID No. 77451
ABRAMSON & DENENBERG, P.C.
1315 Walnut Street | Suite 500
Philadelphia, PA 19107
(215) 398-7066
KChotiner@adlawfirm.com

**EXHIBIT "A"**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DIANA MEIGHAN,
ADMINISTRATRIX OF THE ESTATE OF
MICHAEL BOCKIUS
300 W ASHLAND AVENUE
GLENOLDEN, PA 19036** | **CIVIL ACTION** |
| **Plaintiff** | |
| **Vs.** | **No.: 22-CV-5138** |
| **CITY OF PHILADELPHIA,** | **JURY TRIAL DEMANDED** |
| **And** | |
| **POLICE COMMISSIONER, DANIELLE OUTLAW,** | |
| **LIEUTENANT BISARAT WOREDE, BADGE NO. 72,** | |
| **SERGEANT KRZYSZTOF WRZESINSKI, BADGE NO. 8812,** | |
| **CPL. LORNA ROSE, BADGE NO. 8196,** | |
| **CPL. JOHN DOE, BADGE NO. 8139,** | |
| **P.O. BERNARD TUCKER, BADGE NO. 2471,** | |
| **P.O. KEVIN CREELY, BADGE NO. 4780,** | |
| **P.O. ROBERT MCGRODY, BADGE NO. 3445,** | |
| **P.O. CASEY GALAZKA, BADGE NO. 9337,** | |
| **P.O. PATRICK CLARK, BADGE NO. 9909,** | |
| **P.O. JEROME JOSEPH, BADGE NO. 2311,** | |
| **P.O. HENRY LEWIS, BADGE NO. 3295,** | |
| **P.O. DAVID SOTO, BADGE NO. 7120,** | |
| **P.O. TIERRE WELTON, BADGE NO. 9377,** | |
| **P.O. DONTE BUSH, BADGE NO. 1911,** | |
| **P.O. FRANE MARKUSOVIC, BADGE NO. 6630, and** | |
| **JOHN OR JANE DOE 1-10** | |
| **Defendants** | |

## SECOND AMENDED COMPLAINT

Plaintiff, Diana Meighan, as the administratrix of the Estate of Michael Bockius a/k/a Michael Meighan (hereinafter Michael Bockius), brings this action for damages pursuant to the United States Constitution as well as the statutory and common laws of the Commonwealth of Pennsylvania against the defendants for their decision(s) to deprive pre-trial detainees with Opioid Use Disorder in police custody with adequate medical care and protect them from the known correlated and substantial increase of suicidal behavior, that ultimately resulted in the death by suicide of the Plaintiff's brother, Michael Bockius, who suffered from Opioid Use Disorder while he was an incarcerated pre-trial detainee at the 24th District Philadelphia Police Station.

## I.    STATEMENT OF JURISDICTION AND VENUE

1.    The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 and §1343(a)(1) and (3) and supplemental jurisdiction over the state law claims pursuant to §1367(a) and the principles of pendent and ancillary jurisdiction.

2.    Venue is proper pursuant to 28 U.S.C. §1391(b) because the causes of action upon which the complaint is based arose at the 24th District Philadelphia Police Station, in Philadelphia Pennsylvania.

3.    Plaintiff, Diana Meighan as Administratrix of the Estate of decedent, Michael Bockius, and is entitled to bring this action under the Pennsylvania Wrongful Death Act, 42 Pa. C. S. A. § 8301.

4.    Plaintiff is entitled to bring this action on behalf of the decedent, Michael Bockius, under the Pennsylvania Survival Act, 42 Pa. C. S. A. § 8302.

## II.    PARTIES

5.    Plaintiff, Diana Meighan, individually and as administrator of the Estate of Michael Bockius ("Decedent"), is an adult individual who resides as captioned.

6.    Plaintiff is the administrator of the Estate of Michael Bockius, deceased, having been granted letter of administration on May 24, 2021, by the Register of Wills of Delaware County, Pennsylvania at file number 2321-1738. A true and correct copy of the letter of administration is attached hereto as Exhibit "A."

7.    Defendant, City of Philadelphia, ("the City") is a political subdivision of the Commonwealth of Pennsylvania with offices for service of process at 1515 Arch Street, Philadelphia, Pennsylvania.

8.    Upon information and belief, at all material times Defendant, the City, owned, operated, managed, supervised, and otherwise controlled the Philadelphia Police Department ("PPD") and the Philadelphia Police Districts and all the persons who worked there including all Philadelphia Police Officers and Supervisors.

9.    Upon information and belief, at all material times Defendant, Police Commissioner Danielle Outlaw, was the Philadelphia Police Commissioner and was employed by the City.

10.    Defendant, P.O. Bernard Tucker, Badge No. 2471, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

11.    Defendant, P.O. Kevin Creely, Badge No. 4970, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

3

12.     Defendant, P.O. Robert McGrody, Badge No. 3445, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

13.     Defendant, Corporal John Doe, Badge No. 8139, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

14.     Defendant, P.O. Casey Galazka, Badge No. 9337, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

15.     Defendant, P.O. Patrick Clark, Badge No. 9909, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

16.     Defendant, Lieutenant Bisarat Worede, Badge No. 72, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

17.     Defendant, Sergeant Krzysztof Wrzesinski, Badge No. 8812, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

18.     Defendant, Corporal Lorna Rose, Badge No. 8196, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

19.     Defendant, P.O. Jerome Joseph, Badge No. 2311, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

4

20.     Defendant, P.O. Henry Lewis, Badge No. 3295, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

21.     Defendant, P.O. David Soto, Badge No. 7120, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

22.     Defendant, P.O. Tierre Welton, Badge No. 9377, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

23.     Defendant, P.O. Donte Bush, Badge No. 1911, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

24.     Defendant, P.O. Frane Markusovic, Badge No. 6630, was at all times material hereto a member of the Philadelphia Police Department and is being sued in his individual and official capacity.

25.     Defendants, John or Jane Doe 1-10, were at all times material hereto currently unidentified officers and/or civilian staff medical employees of the Philadelphia Police Department and are being sued in their individual and official capacity.

26.     All Defendants identified/referenced may be served at Defendant the City's office at 1515 Arch Street, Philadelphia, Pennsylvania.

27.     At all material times Defendant, the City, acted/failed to act by and through its employees, workers, servants, and other agents, all in the course and scope of their employment.

28.     Upon information and belief, at all material times Defendant Police Commissioner Outlaw was the highest ranking Police Official in the Philadelphia Police Department and was responsible for: (a) establishing, policies, practices and regulations for the conduct of all employees of the Philadelphia Police Department; (b) hiring, training, supervising, disciplining, and otherwise controlling all persons who worked in the Philadelphia Police Department including all the individual defendants in this case; (c) controlling the operations, practices and tactility of conditions at the police districts; (d) establishing/instilling in all Police personnel a proper regard for the health and safety of all pre-trial detainees; (e) supervising, hiring, training all police personnel who are to be responsible for the safety of pre-trial detainees; (f) implementing adequate policies, procedures, practices, protocols, and other safeguards to ensure pretrial detainees receive constitutionally adequate medical/psychiatric care; (g) implementing adequate policies, procedures, practices, protocols, and other safeguards for suicide risk assessment and suicide prevention; (h) implementing adequate policies, procedures, practices, protocols, and other safeguards to protect pre-trial detainees from dangerous custodial environments, potential suicide risks and other suicide risk enhancers; (i) implementing adequate policies, procedures, practices, protocols, and other safeguards to protect pre-trial detainees in police custody from suicide risk enhancers and from committing suicide; and, (j) implementing adequate policies, procedures, practices, protocols, and other safeguards to provide pre-trial detainees with constitutionally adequate medical care for serious medical conditions, including but, not limited to, Substance Use Disorder(s) ("SUDs") such as Opioid Use Disorder ("OUD").

29.     At all material times Defendant, the City, was responsible for implementing and/or overseeing the implementation of all policies, procedures, practices, protocols, and

other safeguards for pre-trial detainee safety in Philadelphia Prisons and/or Philadelphia Police Department holding cells.

30.     At all material times Defendant, the City, was responsible for hiring, training, supervising, disciplining, firing and/or other control of all persons employed by or otherwise working in the Philadelphia Police Department and/or the Philadelphia Department of Prisons.

31.     At all material times, and regardless of who employed them, all Defendant individuals were acting under the color of state law within the course and scope of their employment, and pursuant to the customs, polices and/or practices, of Defendant, the City.

III.    **OPERATIVE FACTS**

        A.     **It is Well Established that Substance Abuse is a Serious Medical Condition Requiring Mental Health Services.**

32.     In 1992, Congress established the Substance Abuse and Mental Health Services Administration ("SAMHSA").

33.     SAMHSA is the agency within the U.S. Department of Health and Human Services ("HHS") that leads public health efforts to advance the behavioral health of the nation. *See* https://www.samhsa.gov/about-us.

34.     In 2014, SAMHSA noted that "[t]he concept of substance dependence, or addiction, as a brain disease is widely accepted." *See* In Brief: Adult Drug Courts and Medication-Assisted Treatment for Opioid Dependence, Summer 2014, Volume 8, Issue 1.

35.     "The National Association of Drug Court Professionals (NADCP) also accepts the concept of addiction as a disease, stating that addiction is 'in part, a neurological or neuro—chemical disorder characterized by chronic physiological changes to brain regions governing motivation, learning, attention, judgment, insight, and affect regulation." *Id*. (citations omitted).

36.     "Developed to decrease recidivism among substance-involved offenders, adult drug courts oversee substance use disorder treatment for criminal offenders accepted into these programs." *Id*.

37.     "The problem of opioid use is greater among those involved with the criminal justice system than among the general population." *Id*.

38.     Coincidently, in 2014, the First Judicial District ("FJD"), which exercises jurisdiction over the City and County of Philadelphia, celebrated its 25th Anniversary as the nation's first Drug Court. *See* Celebrating Drug Court.

39.     The FJD, "in collaboration with the District Attorney, Department of Behavioral Health and Intellectual DisAbilities (*sic*.), the Defender Association of Philadelphia, the Philadelphia Police Department, the Veterans Administration and others, have partnered to provide treatment programs that support individuals throughout the legal process." *Id*.

40.     The FJD recognized it needed a fundamental changed in the way Philadelphia "responds when an addict or person dealing with mental health issues is arrested" so they can get needed medical care including mental health services. *Id*.

41.     Defendant, the City, also fundamentally changed the way its officers respond when an addict or person dealing with mental health issues is arrested.

42.     In 2015, the Philadelphia Police Department created the Crisis Intervention Team, whose purpose was, in part, "to reduce the likelihood of violent encounters between police and... persons experiencing behavioral or emotional distress, through heightened education in mental health awareness, de-escalation tactics and the coordination of mental health or other services. *See* Directive 10.9 Appendix B.

43.     The PPD defined "behavioral or emotional distress" as "[a] condition of emotional and psychological pain in which an individual is not able to use their cognitive and

8

emotional capabilities, function in society, or meet the ordinary demands of everyday life.
While in this condition, individuals cannot appropriately control their thoughts, feelings and
actions." *Id*.

44.     By making this change in the PPD, defendant, the City, acknowledged that
SUDs are serious medical conditions in some pre-trial detainees that require mental health
services.

>       **B.      The Nexus Between Substance/Opioid Use and Substance/Opioid Use Disorders and Suicidal Behaviors.**

45.     In 2016, SAMHSA issued a report summarizing "the relationship between
substance use and suicide." *See Substance Use and Suicide: A Nexus Requiring a Public
Health Approach* (2016).

46.     In that report, SAMHSA notes that:

- Individuals with substance use disorders (SUDs) are particularly susceptible to suicide and suicide attempts;
- Suicide is a leading cause of death among people who misuse alcohol and drugs;
- Substance misuse significantly increases the risk of suicide;
- Opiates (including heroin and prescription painkillers) were present in 20 percent of suicide deaths;
- Individuals who inject drugs are at about 14 times greater risk for suicide; and,
- The number of emergency department visits for drug-related suicide attempts increased 51 percent overall from 2005 to 2011.

>                                               *Id*. (citations omitted.)

47.     Moreover, "substance abuse is second only to mood disorders in its
association with suicide" and, "[c]omorbidity increases the risk even further." *See* Centers
for Disease Control and Prevention ("CDC") issued its Morbidity and Mortality Weekly Report
("MMWR") titled—*CDC Vital Signs: Suicide rising across the U.S. More than a mental health
concern* (June 12, 2018).

48.     In particular, "[a]dults who abuse opioids weekly or more are more likely to engage in suicide planning and attempts." *See Understanding the Connection: Suicide and Opiod Misuse*.

49.     In fact, "[a]dults who have an Opioid Use Disorder are 13 times more likely to die by suicide than the general population." *Id*.

50.     The shared risk and protective factors for opioid abuse/overdose and suicide are:

- Physical health problems;
- Behavioral Health Problems
- Trauma/Adverse Childhood Experiences; and,
- Social Isolation.

                                             *Id*. (citations omitted.)

51.     Defendant, the City, was aware of this well documented link between opioid use and Opioid Use Disorders and suicidal behaviors.

**C. Defendant, the City, Did Not Implement Recommended Changes in the PPD to Provide Pre-Trial Detainees with Opioid Use Disorder in Police Custody With Adequate Necessary Medical/Psychiatric Care and Ignored the Known Associated Increased Risk of Suicidal Behavior.**

52.     On May 19, 2017, the Mayor's Task Force to Combat the Opioid Epidemic in Philadelphia issued its Final Report & Recommendations ("Report").

53.     The "Report describes a public health crisis in Philadelphia caused by prescription and illicit opioids and characterized by high and increasing rates of Opioid Use Disorder and overdose death, as well as their devastating personal, family, and societal consequences." *Id*.

54.     The OTF was charged with developing a comprehensive and coordinated plan to reduce Opioid Use Disorder and its associated morbidity and mortality in Philadelphia, and with drafting a report of findings and recommendations for action for the mayor. It

conducted its work through meetings of the full Task Force as well as meetings of five

subcommittees, each of which addressed a different aspect of the epidemic. *Id*.

55.     Opioid Task Force Members included the Commissioner of the Philadelphia

Police Department and the Commissioner of the Philadelphia Department of Prisons. *Id*.

56.     The OTF's five subcommittees were:

1.  Public Education and Prevention Strategies;
2.  Service Access, Best Practices, and Treatment Providers;
3.  Overdose Prevention and Harm Reduction;
4.  Justice System, Law Enforcement, and First Responders; and,
5.  Data Analysis and Sharing.

*Id*.

57.     In addition to their specific topics to address, the subcommittees were given

overall charges, in which included the requirement that they "thoroughly understand and

analyze the key issues, needs, and priorities of the opioid epidemic as it impacts and relates

to their subcommittee area." *Id*.

58.     The subcommittees were required to submit a written report to the OTF,

summarizing their findings related to their specific subcommittee area and providing

justifications and recommendations. *Id*.

59.     The OTF's Final Report begins with a message from then Mayor, James F.

Kenney, which states, in pertinent part:

> The opioid epidemic affects all of us in Philadelphia. Drug
> overdoses, and overdoses involving opioids, are now a leading
> cause of death in our city. Opioids are also destroying families
> and relationships and undermining the quality of life in
> Philadelphia.
>
> In order to address this epidemic in a thorough and systematic
> way, I convened a Task Force of stakeholders working in public
> health, substance use disorder treatment, medical care, law
> enforcement, advocacy, and managed care, as well as
> representatives from the community. This Task Force… has
> committed over the last several months to identify ways that we

11

> can individually and collectively turn the tide on Philadelphia's opioid epidemic. This outstanding report contains recommendations that can do just that.

*Id.*

60.     The Report clearly informed defendant, the City, that:

> The crisis caused by opioids encompasses opioid use, Opioid Use Disorder, and related morbidity and mortality. Each of these is a problem of its own and each leads to many other individual and social problems. Opioid use and addiction are not new issues, but they have reached epidemic proportions in the city and demand a new and coordinated response.

*Id.*

61.     In other words, so many people were suffering from opioid use and Opioid Use Disorder with their related morbidity and morality, defendant, the City could no longer ignore this serious medical condition and the medical care it requires.

62.     The Report recognizes that a significant number of individuals using opioids for nonmedical purposes will make the transition to heroin." *Id.*

63.     The Report noted that:

> This transition is particularly likely to occur in Philadelphia because heroin in the Philadelphia-Camden area is especially pure and cheap. In 2014, Philadelphia's heroin averaged 65 percent purity, the highest in the country among all samples tested.11 Based on national data showing that 20 percent of heroin users seek or participate in treatment for their heroin use, we estimate that there are at least 70,000 heroin users in Philadelphia. This is likely a conservative estimate, as it does not include individuals who may have obtained care in the private treatment system.

> In 2014, the synthetic opioid fentanyl began to appear in testing of opioid overdose victims, indicating that criminal drug networks were producing the drug and selling it on the street to heroin users. By 2016, fentanyl was found in nearly half of drug overdose deaths (see graph below).

*Id.* (graph omitted)

64.     In fact, "[i]n Philadelphia, 907 died due to drug overdose in 2016—an increase from 702 in 2015 and three times the number of homicides." *Id*.

65.     "In 2015, Philadelphia's rate of 46.8 drug overdose deaths per 100,000 residents far outpaced other large cities, such as Chicago (15.4) and New York City (11.2)." *Id*.

> Approximately 80 percent of drug overdose deaths in Philadelphia involve opioids, including prescription opioids, heroin, and fentanyl. The increasing presence of fentanyl, a potent synthetic opioid pain medication that is 50 to 100 times stronger than morphine, is contributing to overdose fatalities. In 2016, fentanyl was found in 412 drug overdose decedents in Philadelphia, a sharp increase from nine deaths in 2012.
>
> *Id*.

66.     Philadelphia's exorbitant drug overdose deaths per 100,000 correlates to its larger percentage of drug users in its population.

67.     The Report, placed defendant, the City, on notice of the fact that "[p]eople with substance use disorder interact with the criminal justice system in many ways" and that "[p]revalence of substance use disorder is higher among prison populations than among the general population" and "[s]ubstance use disorders that co-occur with other serious mental illness also increase likelihood of arrest for nonviolent or drug-related offenses."

68.     In fact, the "Department of Prisons provides withdrawal management about 8,000 times annually." *Id*.

69.     Furthermore, defendant, the City, was aware that the prevalence of psychiatric disorders, including substance use disorder, is higher among inmates than in the general population.

70.     The Report identified a lack of SUD competency in Non-SUD professionals "within health care and other social services (such as child welfare and criminal justice)"

who were "undertrained to deal with issues related to SUDs" and who lacked" basic SUD competency so that SUD screening can take place outside of the formal treatment system." *Id*.

71.     After the Report was issued, defendant, the City, knew of the risk to individuals in the justice system continuum, from arrestees to sentenced prisoners, including pre-trial detainees such as the Decedent, with OUD who were not receiving adequate treatment services. *Id*.

72.     The report found that "non-SUD professionals within health care and other social services (such as child welfare and criminal justice) need basic SUD competency so that SUD screening can take place outside of the formal treatment system."

73.     Because of the drastic increase in people with Opioid Use Disorder resulting from Philadelphia's Opioid Epidemic, the Report recommended that defendant, "[t]he City should develop strategies to increase the capacity and competency of non-substance use disorder (SUD) professionals in health care and other social services to identify SUDs and work with them." *Id*.

74.     As a result of the Report, defendant, the City, implemented changes in the intake procedures within the Philadelphia Department of Prisons, which assessed and provided treatment to pre-trial detainees with SUDs.

75.     Despite the fact that most, if not all, pre-trial detainees are in police custody before entering a prison, defendant, the City, did not implement the same changes to the PPDs' intake procedures.

76.     Astonishingly, even though defendant, the City, decided to deny SUD necessary medical treatment to pre-trial detainees with OUD, like the Decedent, unless and until they reached the prison, it failed to change its policies and/or procedures and/or train

14

its officers to identify pre-trial detainees with SUDs who it knows are at high risk of suicidal behavior despite the fact it tells its members that "[t]he first three (3) hours of detention are the most critical for suicide attempts."

77.      Moreover, the who may exhibit tendencies towards suicide medical checklist so that those pre-trial detainees were classified as "high risk" when it recognized the fact that "[t]he first three (3) hours of detention are the most critical for suicide attempts" and knew that:

- Substance abuse is second only to mood disorders in its association with suicide and, comorbidity increases the risk even further;
- Adults who abuse opioids weekly or more are more likely to engage in suicide planning and attempts;
- Adults who have an Opioid Use Disorder are 13 times more likely to die by suicide than the general population;
- Suicide is the number one cause of death in jails and lockups; and,
- The vast majority of suicide victims were not screened properly at the time of arrest for potential suicidal behavior.

78.      Defendant, the City's, decision not to provide screening for and adequate medical care to pre-trial detainees with OUD, like the Decedent, while they are in police custody is no different than defendant, the City's, previous decision to deny adequate medical care to diabetic pre-trial detainees in police custody.

### D.  Defendant, the City, Declares War on Opioids But Continues Its Policy of Denying Adequate Medical Care to the Prisoners Suffering From Opioid Use Disorder Its Police Department Detains and Fails to Protect From the Known Increased Risk of Suicidal Behavior.

79.      On October 3, 2018, the Mayor of defendant, the City, issued Executive Order No. 3-18, Opioid Emergency Response Executive Order.

80.      That Executive Order established the Opioid Emergency Response Group ("OERG") and required the "Managing Director's Office of Criminal Justice and Public Safety

shall lead efforts to substantially reduce criminal activity by reducing open-air drug use and sales, increasing arrests for the solicitation of prostitutes, developing safe routes to school and transit corridors, securing public spaces, reducing property crimes, and increasing the volume of drugs seized."

81.     Defendant, the City's, *War on Opioid*s would necessarily lead to an increase in the number of individuals who suffered from OUD, like the Decedent, that would be taken into police custody.

82.     Around the same time, defendant, the City, declared its War on Opioids, its police department implemented the Police-Assisted Diversion ("PAD") program.

83.     In that program, instead of denying adequate medical care to individuals with OUD, like the Decedent, who were arrested for drug-dependent driven crime(s) until they reached the prison, certain police officers who arrested these types of individuals for certain non-violent drug-dependent driven crime(s), in certain police districts, during certain times, were given discretion to divert them from the criminal justice system and release them from custody so that they can receive needed medical care and treatment.

84.     What makes defendant, the City's, decision to not provide people in police custody with the same care it provides people in its prisons even more egregious, is that it claims that, in response to the Opioid Epidemic, it is taking a "health-centered approach" to law enforcement.

85.     However, when defendant, the City, by and through its police officers, does not divert said individuals and, instead, takes custody of them, it fails to provide that needed medical treatment.

86.     Even though defendant, the City, knows pre-trial detainees who suffer from OUD require medical treatment and it made a decision to <u>deny</u> that treatment unless and

16

until the pre-trial detainees are transferred into the custody of the Philadelphia Prison Department.

87.     Only then will, defendant, the City, screen pre-trial detainees suffering from OUD, like the Decedent, for OUD so that they can receive constitutionally adequate medical care.

88.     Defendant, the City's, decision to shirk its responsibility to pre-trial detainees suffering from OUD in custody of the PPD, like the Decedent, further demonstrates its deliberate indifference to their needs.

89.     Astonishingly, even though it was denying adequate medical care to pre-trial detainees with OUD, it made no changes to protect them from the increased risk of suicidal behavior they have.

> ### E.   The Individual Defendant Officers Arrest the Decedent and Know He Suffers From Opioid Use Disorder but Deny Adequate Medical Care and Fail to Protect Him From the Increased Risk of Suicidal Behavior.

90.     On January 5, 2021, at or around 9:25 a.m., Defendants, Police Officers Creely, McGrody, Galazka, and Clark ("Arresting Officers"), were in the area of 2800 Rosehill Street in the City and County of Philadelphia, Pennsylvania.

91.     At that date, time, and location, the defendants, Arresting Officers, were in the Kensington area of Philadelphia, which is within the 24th District, a district encompassed by Executive Order No. 3-18, that is supposed to be participating in the PAD program during that time.

92.     Then and there, the Decedent and another individual were arrested for a narcotics violation.

93.     The Arresting Officers reported that the Decedent was homeless.

94.     Moreover, defendants, the Arresting Officers, recovered 7 packets of suspected heroine from the Decedent.

95.     Defendants, the Arresting Officers, did not recover any money from the Decedent.

96.     Clearly, the Decedent was displaying signs of his opioid addiction and Opioid Use Disorder.

97.     But, despite the fact that the Decedent was arrested for a low-level drug offense, was under the influence of fentanyl and/or showing signs of intoxication and/or withdrawal due to opioid use and use disorder, the Arresting Officers failed to provide the Decedent with adequate medical care.

98.     Instead of taking the PAD health centered approach to law enforcement and diverting the Decedent to the PAD programs supportive, peer-based social services that were customized to the Decedent's needs, the Arresting Officers transported Decedent to a Police District.

99.     At the District, the Decedent was not provided with a substance use disorder assessment and treatment as the Report recommended.

100.    Moreover, the only "assessment" the Decedent could have received was from the Arresting Officers who should have completed a "Detainee Medical Checklist."

101.    Unfortunately, even if the Decedent received that assessment, defendant, the City, failed to direct its officers that people suffering from OUD, like the Decedent, should be considered "High-Risk Suicide Detainees" and treated accordingly.

102.    Despite defendant, the City's, known increased risk of suicidal behavior in people with OUD, like the Decedent, especially during the first three hours of custody, "High-Risk Suicide Detainees" does not include OUD in the list of suicide predisposing factors.

103. In fact, had the Decedent been evaluated by Philadelphia Prison Staff, that he suffered from OUD would have caused prison staff to place him on suicide watch.

104. Unfortunately, the Decedent never made it to the prison.

105. Because defendant, the City, did not provide the defendants, Arresting Officers, with the necessary training and/or forms to identify OUD as recommended in the Report and the corresponding constitutionally adequate medical care, the Decedent began suffering from severe withdrawal symptoms, including, but not limited to, acute onset abdominal pain, nausea, and vomiting with red streaks while he as being held at the district.

106. Then, on January 6, 2021, at approximately 1:30 a.m., Philadelphia police officers called 911 and the Philadelphia Fire Department EMS arrived an evaluated Decedent who reported that he was experiencing withdrawal symptoms.

107. Defendants were aware that Decedent reported to EMS that he is a heroin user and was suffering from opioid withdrawal.

108. Philadelphia EMS transported Decedent to Albert Einstein Medical Center (AEMC) where he presented with the aforementioned symptoms.

109. Upon examination, Decedent was initially diagnosed with extremely painful kidney stones and received 4 mg of morphine to ease his symptoms.

110. After tests were completed, hospital staff ruled out all causes for Decedent's symptoms other than opioid withdrawal and Opioid Use Disorder.

111. Hospital staff administered another 4 mg of morphine to Decedent before they released him.

112. Decedent was released into police custody with discharge instructions that indicated he was an opioid user who has Opioid Use Disorder and was suffering with opiate withdrawal.

19

113.    The transporting officers were informed that Decedent had been given morphine and was suffering from opioid withdrawal.

114.    Upon information and belief, Decedent's Detainee Medical Checklist was not updated to reflect the fact that he was given morphine and suffering from withdrawal.

115.    Despite the fact that decedent was under the influence of, among other things, the morphine he was given by hospital staff, and suffering from withdrawal, Decedent was not placed into a special observation cell to prevent self-harm and suicide.

116.    Less than three (3) hours from his return to the police district, at approximately 8:35 am in the morning, decedent was found hanging from his sweatshirt.

117.    Upon information and belief, Decedent was refused and/or denied medical assistance by some of the individual defendants for a substantial period of time from when he returned from the hospital until he was found hanging in his cell.

118.    Upon information and belief, some or all Defendants did not render adequate, proper, appropriate, or timely medical treatment or care to Decedent even after he was found in his holding cell hanging from his sweatshirt.

119.    The defendant Philadelphia Police Department Officers did not render emergency aid and/or rendered inadequate care and/or unreasonably delayed in calling 911 for outside emergency medical services from the Philadelphia Fire Department.

120.    Emergency services were eventually called, and Decedent was taken by EMS back to AEMC.

121.    Decedent was pronounced dead at AEMC due to cardiac arrest caused by hanging at approximately 9:00am.

122.    Decedent's family was never notified by the police, but only found out by conducting their own search.

123.   At all times relevant, the individual defendants knew that Decedent was suicidal and/or at high-risk for suicide.

124.   At all times relevant, the Defendants knew or should have known from that Descendent and other pre-trial detainees suffering from opiate withdrawal are at higher risk of suicidal behavior that is further increased by their detention.

125.   The Defendants failed to properly monitor Decedent allowing him to be unsupervised which allowed him the time to fashion a noose from his shirt and hang himself.

126.   Defendants were on notice that Decedent was suffering from psychiatric conditions, including but not limited to Opioid Use Disorder, and that hospital staff administered morphine while he was in police custody because the symptoms Decedent suffered from Opioid Use Disorder and was experiencing opioid withdrawal before they placed Decedent back into the holding cell.

127.   Upon information and belief, Plaintiff alleges that, prior to his death, Defendants knew and/or should have known of Decedent's Opioid Use Disorder and/or that he was suffering from opioid withdrawal and/or that individuals suffering from said conditions are at increased risk for suicide and/or suicidal ideation and intentionally and deliberately or with reckless indifference, disregarded Decedent's serious medical conditions and corresponding increased risk of suicide, all in violation of his rights under the United States Constitution.

128.   Defendants violated Decedent's rights by any and all of the following: (a) failing to place Decedent on an appropriate and effective suicide watch; (b) failing to have Decedent evaluated by medical staff; (c) failing to transfer Decedent to an appropriate mental health facility; (d) failing to remove from Decedent's jail cell all items by which

Decedent could harm himself, including his sweatshirt; (e) failing to provide Decedent with the proper necessary psychiatric care and reasonable safe guards and other precautions to assure his safety; (f) failing to properly monitor and watch Decedent to protect him from harming himself; (g) failing to create, establish and/or implement an adequate suicide prevention system and/or failing to follow their own internal guidelines and directives; (h) failing to train Police Officers and other employees of Defendant's who interacted with detainees to recognize potentially suicidal detainees; (i) failing to train Police Officers and other employees who interacted with detainees to recognize the signs of Opioid Use Disorder and opioid withdraw; (j) failing to create, establish and/or implement an adequate substance abuse assessment for detainees and/or failing to follow their own internal guidelines and directives for detainees suffering from substance abuse disorders including, but not limited to, Opioid Use Disorder..

129.   As Plaintiff's Decedent was in custody as a pre-trial detainee, there existed a special relationship between Defendants and Plaintiffs Decedent.

130.   Defendants were trusted to provide Plaintiff's Decedent with appropriate and timely medical care and treatment and further were responsible for his protection, safety, well-being and life while he was in custody at the Philadelphia Police Department.

131.   During the period of time the Decedent was detained at the police district holding cell he was under the influence of drugs, withdrawing, was in need of mental health care and was at increased risk of suicide, all of which was known by Defendants as evinced by the Final Report of the Mayor's Opioid Task Force or should have been known to them upon use of reasonable care.

132.   At all times relevant hereto, Decedent was or should have been provided proper safeguards for his safety and/or provided proper care, medical or otherwise, while

in the custody of Defendants against his will.

133.   Prior to his death, Defendants had actual knowledge of Decedent's compromised mental health, knew and/or had reason to know of his risk for suicide, but deliberately and/or recklessly failed to act in disregard of Decedent's compromised mental health state and heightened risk of suicide.

134.   Despite said knowledge, Defendants failed to take necessary and available precautions to protect Decedent, as is required by the 14th Amendment to the United States Constitution.

135.   Despite the fact that Defendants knew or should have known of Decedent's psychiatric condition and increased suicide risk, Decedent was not provided proper safeguards, monitoring, or attention by the Defendants.

136.   Upon information and belief, Defendants knew or should have known that Decedent presented a high risk of suicide while in detention in the holding cell.

137.   Upon information and belief, the cell in which the Decedent was held during his detention was or should have been under frequent observation by plain sight and sound of Defendant's police officers.

138.   As a direct result of Defendant's conduct described above, Decedent suffered great personal injury and felt great pain and suffering between the time his suicide attempt began through the time of his death.

139.   As a further result of the Defendant's conduct, Decedent's life ended, which resulted in loss of earnings and income to which his Estate would have been entitled.

140.   Upon information and belief, Decedent's suicide was not the first at a Philadelphia Police Department District.

141.   Pre-trail detainees, including Decedent, are at risk for great physical harm,

injury, and death due to the failure of the Defendants to create or implement an adequate suicide prevention program and by their failure to properly train the employees in how to recognize potentially suicidal detainees, including but not limited to individuals who suffer from Opioid Use Disorder and/or opioid withdrawal and set in motion proper safeguards and protections from them.

142.   Indeed, in this case Defendants  had actual knowledge of Decedent's mental and substance abuse/withdrawal issues that are directly correlated to an increased risk of suicide.

143.   Defendants are under a duty and obligation to provide a safe and suitable detention facility.

144.   Pre-trial detainees are entitled to the same constitutional protection as persons convicted of crimes. <u>Diaz vs. Houck</u> 159 Pa. Cmwlth.274,632 A.2d 1081 (1993).

145.   Defendants knew prior to January 5, 2021, that there had been suicides and suicide attempts by pre-trial detainees within the police station holding cells.

146.   Each of these suicides and suicide attempts increased the obligation on the part of the Defendants to implement policies and training of personnel to ensure the safety of pre-trial detainees.

147.   Moreover, prior to January 5, 2021, defendants knew of the relationship between Opioid Use Disorder and suicidal behavior.

**IV.   UNCONSTITUTIONAL ACTS AND OMISSIONS OF ALL DEFENDANTS**

148.   Despite Defendants' knowledge of past suicides and suicide attempts by pre-trial detainees suffering from OUD, and/or the increased risk of suicide and suicide attempts by those suffering from OUD, the Defendants have failed and continue to fail to take necessary steps to correct or remedy the deficiencies in the operation of the

Philadelphia Police District holding cells that facilitates suicides and suicide attempts such individuals.

149.    As members of the Philadelphia Police Department at the time of the incident, Defendants were responsible for authorization, implementation, and oversight of the policies, procedures, and practices, and more specifically those policies, procedures, and practices regarding the placement of detainees withdrawing from drugs and in need of mental health care, as well as, suicide screening for prevention of suicide for those detainees at high risk for potentially causing harm to themselves.

150.    Decedent's suicide was predictable and the product of the deliberate indifference of the Defendants.

151.    This deliberate indifference on the part of Defendants resulted from official positions and policies and/or from well settled practices on the part of the Defendants so as to establish them as official policy.

152.    By approving, condoning, acquiescing in the policy, practice and/or custom of housing persons with a known vulnerability to suicidal behavior, as well as suicidal ideology, such as the Decedent, and with a known history of severe mental health issues, addiction issues, and withdrawal symptoms, such as the Decedent, Defendants were deliberately indifferent to the decedent's vulnerability to suicide, and the substantial risk that he would commit suicide while being housed at a police district, in violation of the decedent's rights under the Fourteenth Amendment.

153.    By approving, condoning, acquiescing in the policy, practice and/or custom of housing persons with severe mental health issues and/or Opioid Use Disorder, addiction and withdrawal symptoms, such as Decedent, without providing Decedent or other similarly situated detainees with proper care or adequate medical treatment for their mental

25

health/addiction and withdrawal issues, Defendants were deliberately indifferent to the decedent's conditions of confinement, which deprived him of the minimal civilized measure of life's necessities, and to his right to adequate medical care for his serious medical needs, in violation of the decedent's rights under the Fourteenth Amendment.

154.    Defendants acted with deliberate indifference when they failed to place decedent in a special observation cell on suicide watch, remove his sweatshirt that could be used as a ligature, and/or place him in a cell with another detainee, and observe decedent closely, every ten (10) minutes or less, in order to provide him with the treatment and assistance that he needed in accordance with Philadelphia Police Department's policy and Appendix "E" of Philadelphia Police Department Directive 7.8.

155.    Defendants had a constitutional duty to protect the decedent from the risk of suicide and ensure that he received adequate medical care for his deteriorating mental and physical health, and despite the aforementioned Defendants' knowledge that the decedent posed a suicide risk with severe mental health problems and addiction/withdrawal issues which conduct constituted deliberate indifference to the decedent's right to be safe from suicide and right to adequate medical care in violation of the Fourteenth Amendment.

156.    Defendants intentionally and/or with deliberate indifference ignored the decedent's Opioid Use Disorder and/or his substantial risk of suicide while he was being housed at the police district, which was the direct and/or proximate cause of the decedent's suicide.

157.    Decedent's mental health and addiction/withdrawal issues constituted a serious medical condition, and Defendants were deliberately indifferent to the decedent's serious medical condition when they decided to deny him needed treatment and assistance unless and until he made it to the prison.

158. As the direct and proximate result of all Defendants deliberate indifference to the decedent's vulnerability to suicide and serious medical needs, the Decedent suffered from withdraw, eventually hung himself, and died.

159. As the direct and proximate result of all Defendants deliberate indifference to the decedent's vulnerability to suicide and serious medical needs, the Decedent suffered pain and suffering, enormous emotional pain, conscious suffering, and a complete loss of earnings and earning capacity.

V.   **CLAIMS**

**COUNT I – 42 U.S.C. § 1983**
**14TH AMENDMENT—DELIBERATE INDIFFERENCE TO KNOWN RISK OF SUICIDE**
**MICHAEL BOCKIUS v. ALL INDIVIDAL DEFENDANTS**

160. All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

161. As alleged above, all Defendants knew or should have known that Decedent, who suffered from Opioid Use Disorder and was experiencing severe withdrawal symptoms, was particularly vulnerable to suicide and that there was a strong likelihood that he would attempt suicide, and notwithstanding this knowledge of a significant risk to decedent's health and safety, they were deliberately indifferent by failing to take any action or precaution to prevent him from hanging himself, such as, causing him to be placed into the PAD program and/or placing him on suicide watch and/or removing articles of clothing for his protection and/or placing him in the designated special observation cell observing decedent at intervals not to exceed ten (10) minutes that would not exacerbate his severe mental health and addiction/withdrawal issues and vulnerability to suicide.

162. All Defendants intentionally and/or with deliberate indifference ignored the decedent's risk or vulnerability to suicide by placing him in a cell without needed observation,

and with the knowledge that there was a strong likelihood that he would attempt to kill himself by hanging, the predominant method used by suicidal detainees.

163.    As the direct and proximate result of the above deliberate indifference of all Defendants Decedent hung himself within the first three (3) hours of his detention upon his return from the AEMC and died.

164.    The above-described actions of all Defendants were so malicious, intentional, and reckless and displayed such a reckless indifference to the decedent's rights and well-being, that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. §1983 and §1988, Plaintiff, Diana Meighan, demands compensatory and punitive damages against all individually named Defendants in an amount sufficient to fully and adequately compensate the Plaintiff and punish and deter the defendants, plus interest, costs, attorney's fees and all other appropriate relief.

### COUNT II - 42 U.S.C. § 1983
### 14th AMENDMENT – INADEQUATE MEDICAL CARE
### MICHAEL BOCKIUS v. ALL INDIVIDUAL DEFENDANTS

165.    All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

166.    The decedent entered the police district with serious mental health issues and clearly intoxicated and Defendants knew or should have known that Decedent was withdrawing from the highly addictive drug, fentanyl, and was likely to exhibit suicidal thoughts and tendencies. Without the proper treatment and assistance, Defendants know or at a minimum should have known that Decedent was at a high risk of suicide, based upon the Philadelphia Police Department own directives and training.

167.    Despite Defendants knowledge of decedent's serious medical condition and his serious medical needs, they intentionally or with deliberate indifference ignored the Decedent's

medical needs and failed to provide him with adequate medical care and/or the needed

suicide prevention while he was incarcerated

168.   As a direct and proximate result of the malicious, intentional, deliberate, and/or

reckless actions of the Defendants in denying Decedent the necessary adequate medical care

for Opioid Use Disorder and/or observation for signs of suicidal behavior, his mental condition

deteriorated, resulting in his suicide.

169.   The above-described actions of the Defendants were so malicious, intentional

and reckless and displayed such a reckless indifference to the decedent's rights and well-

being, that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. §1983, Plaintiff, Diana Meighan, demands

compensatory and punitive damages against the individually named Defendants in an amount

sufficient to fully and adequately compensate the Plaintiff and punish and deter the

defendants, plus interest, costs, attorney's fees and all other appropriate relief.

### COUNT III - 42 U.S.C. § 1983
### 14th AMENDMENT – BYSTANDER/SUPERVISOR LIABILITY
### MICHAEL BOCKIUS v. ALL INDIVIDUAL DEFENDANTS

170.   All of the preceding paragraphs are incorporated by reference as if more fully

set-forth herein.

171.   The plaintiff believes and therefore avers that Defendants ignored and stood idly

by while Decedent was exhibiting symptoms of Opioid Use Disorder and/or opioid withdrawal

and/or suicidal ideation, which deprived Decedent of his constitutional rights and privileges

under the Constitution of the United States.

172.   The plaintiff believes and therefore avers that Defendants failed to prevent

Decedent from committing suicide, and therefore deprived decedent of his rights under the

Fourth and Fourteenth Amendments.

173.    As detailed above, defendants failed to fulfill their obligation to intervene when they had an independent and affirmative duty to provide adequate medical care for Decedent's Opioid Use Disorder and/or prevent Decedent from committing suicide.

174.    As detailed above, by failing to intervene, Defendants effectively assisted decedent in committing suicide and therefore deprived the Decedent of his constitutional rights and privileges under the Constitution of the United States, more specifically the Fourth and Fourteenth Amendments.

175.    The above-described actions of the defendants in their individual capacities were so malicious, intentional, and reckless and displayed such a reckless indifference to the plaintiff's rights and well-being that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. §1983 and §1988, plaintiff demands compensatory and punitive damages the individually named Defendants in an amount sufficient to fully and adequately compensate the Plaintiff and punish and deter the defendants, plus interest, costs, attorney's fees and all other appropriate relief.

### COUNT IV - 42 U.S.C. § 1983
### MONELL CLAIM
### MICHAEL BOCKIUS v. Defendant, The City of Philadelphia

176.    All of the preceding paragraphs are incorporated by reference, as if more fully forth herein.

177.    As demonstrated above, the Defendant, City of Philadelphia, made a decision to deny adequate medical care to pre-trial detainees with Opioid Use Disorder unless and until they arrived at the prison.

178.    Moreover, despite knowing the increased risk of suicidal behavior by pre-trial detainees with Opioid Use Disorder that it was denying adequate medical care to, defendant, the City, did nothing to protect these individuals from this increased risk.

179.    Furthermore, the Defendant, City of Philadelphia, has adopted and maintained for many years a recognized and accepted policy, custom and/or practice of condoning and/or acquiescing in the failure to provide appropriate medical care and/or suicide prevention; for detainees such as Decedent who were suffering from mental health and/or Opioid Use Disorder and/or opioid withdrawal while being detained at holding cells in the police districts, and subjecting them to the same type of treatment to which Decedent was subjected. Said policy, custom and practices violates the Fourteenth Amendment of the Constitution of the United States, the laws of the United States and of the Commonwealth of Pennsylvania.

180.    The Plaintiff believes and therefore avers that the Defendant, City of Philadelphia, has adopted and maintained for many years, a recognized and accepted policy, custom, and practice of systematically failing to properly train, investigate, supervise and discipline police officers, including the individual defendants, regarding the constitutional obligation to protect detainees with mental health and addiction issues being detained at police districts in accordance with the requirements of the Fourteenth Amendments of the Constitution of the United States, the Constitution of the Commonwealth of Pennsylvania, the laws of the United States and of the Commonwealth of Pennsylvania.

181.    The Defendant, City of Philadelphia, has been deliberately indifferent to the rights of citizens of the City of Philadelphia to be free from deliberate indifference to known risk of suicides and inadequate medical care for those detainees suffering from mental health and addiction issues, which deliberate indifference violates the plaintiff's rights under the Fourteenth Amendments of the Constitution the laws of the United States and of the Commonwealth of Pennsylvania.

182.    The Plaintiff believes and therefore avers, that at all material times, the Defendant, City of Philadelphia, knew or should have known of the above-described policy,

custom and/or practice of the Philadelphia Police Department, and that they deliberately, knowingly and intentionally failed to take measures to stop or limit the policy, custom and practice.

183.    By failing to take action to stop or limit the policy and/or custom and/or practice by remaining deliberately indifferent to the systematic abuses which occurred in accordance with and as a direct and proximate result of the policy, Defendant, City of Philadelphia, condoned, acquiesced in, participated in, and perpetrated the policy in violation of the plaintiffs' rights under the Fourth and Fourteenth Amendments of the Constitution of the United States, the Constitution of the Commonwealth of Pennsylvania, the Laws of the United States and of the Commonwealth of Pennsylvania.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983 and Pennsylvania Law, the Plaintiff, Diana Meighan as the administrator of the Estate of Michael Bockius, demands compensatory damages and injunctive relief against defendants, the City of Philadelphia and Commissioner Outlaw, jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and all other appropriate relief.

### COUNT V – WRONGFUL DEATH
### <u>DIANA MEIGHAN v. ALL DEFENDANTS</u>

184.    All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

185.    Plaintiff, Diana Meighan brings this action pursuant to the Wrongful Death Act 42 Pa. C.S.A. Section 8301 and claims all damages recoverable under the Pennsylvania Wrongful Death Act.

186.   As a direct and proximate result of the aforementioned actions of the defendants, the decedent, Michael Bockius, his family and his Estate have suffered severe emotional and pecuniary losses and damages including the following:

(a)   an amount which will cover all funeral, burial and estate administration expenses incurred;

(b)   an amount which will fairly and adequately compensate the family members of the decedent for their loss of such contributions as they would have received between the time of the death of the decedent and today. This includes all monies that the decedent would have spent for or given to his family;

(c)   an amount which will fairly and adequately compensate his family for the loss of such contributions as the decedent would have contributed to the support of his family between today and the end of his normal life expectancy; and

(d)   an amount which will fairly and adequately compensate his family for the pecuniary and emotional value of the services, society and comfort that he would have given to his family had he lived including such elements as provision of physical comfort and services and provision of society and comfort.

187.   As a direct and proximate result of the Defendants' wrongdoing as set forth above, which is incorporated herein, Michael Bockius' Wrongful Death beneficiaries suffered, are suffering, and will, for an indefinite period of time in the future, suffer damages, injuries and losses including but not limited to, a loss of financial support, and the beneficiaries have been wrongfully deprived of the contributions they would have received from him, including monies which he would have provided for items such as clothing, food, shelter, medical care, education and entertainment, recreation and gifts.

188.    As a direct and proximate result of Defendants' wrongdoing as set forth above, which is incorporated herein, Michael Bockius' Wrongful Death beneficiaries have been caused to incur and pay various expenses for medical treatment, hospital care, custodial care, and funeral and other expenses related to his death.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983 and Pennsylvania Law, the Plaintiff, Diana Meighan as the administrator of the Estate of Michael Bockius, demands compensatory and punitive damages against defendants, jointly and/or severally, in an amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs, attorney's fees and all other appropriate relief.

### COUNT VI – SURVIVAL ACTION
### DIANA MEIGHAN v. ALL DEFENDANTS

189.    All of the preceding paragraphs are incorporated by reference as if more fully set-forth herein.

190.    Plaintiff, Diana Meighan brings this action on behalf of the Estate of Michael Bockius, deceased, by virtue of the Survival Act, 42 Pa.C.S.A. § 8302, and claims all benefits of the Survival Act on behalf of Michael Bockius' Estate and other persons entitled to recover under law.

191.    As a direct and proximate result of the aforementioned actions of the defendants, the decedent, Michael Bockius, his family and his estate are entitled to damages which shall include the following:

> (a)    an award of the total net amount that the decedent would have earned between the date of his death and today;
>
> (b)    an award of the net amount that the decedent would have earned between today and the natural end of the decedent's life expectancy; and
>
> (c)    an award of such an amount as will fairly and adequately compensate the estate for the mental and physical pain and suffering that the

34

decedent endured from the moment of the improper treatment by the defendants to the moment of his death as a foreseeable result of the improper treatment.

192.    As a direct and proximate result of Defendants' wrongdoing as set forth above, which is incorporated herein, Plaintiff, Diana Meighan claims on behalf of the Estate of Michael Bockius, all damages suffered by the Estate by reason of the death of Michael Bockius, including without limit the generality of the following: the severe injuries to Michael Bockius, which resulted in his death; the anxiety, horror, fear of impending death, mental disturbance, pain, suffering and other intangible losses which Michael Bockius suffered prior to his death; the loss of past, present and future earning capacity suffered by Michael Bockius, from the date of his death until the time in the future he would have lived had he not died as a result of the injuries he sustained; expenses for medical care; the loss and total limitation and deprivation of his normal activities, enjoyment of life, pursuits and life's pleasures from the date of his death until such time in the future as he would have lived had he not died as a result of the injuries sustained.

WHEREFORE, pursuant to 42 U.S.C. § 1983 and Pennsylvania Law, the Plaintiff, Diana Meighan as the administrator of the Estate of Michael Bockius, demands compensatory and punitive damages against defendants, jointly and/or severally, in an

amount sufficient to fully and adequately compensate the Plaintiff, plus interest, costs,

attorney's fees and all other appropriate relief.

Respectfully submitted,

L. KENNETH CHOTINER, LL.M.
Pennsylvania ID No. 77451
ABRAMSON & DENENBERG, P.C.
1315 Walnut Street | Suite 500
Philadelphia, PA 19107
(215) 398-7066
KChotiner@adlawfirm.com

**EXHIBIT "B"**

### ABRAMSON & DENENBERG, P.C.
*Attorneys-at-Law*

Thomas Bruno, II*°▲
David H. Denenberg*▲
Alan E. Denenberg*°
D. Ben van Steenburgh*
Dean Gay*
Vazken A.E. Zerounian*

\* Member PA Bar
° Member NJ Bar
▲Member DC Bar

Twelfth Floor
1315 Walnut Street
Philadelphia, PA 19107
e-mail: adenenberg@adlawfirm.com
Fax: (215) 546-5355

(215) 546-1345

A Pennsylvania Corporation
registered in New Jersey
(856) 354-9385

Benjamin Abramson
1932 - 1978

Of Counsel:
Armando A. Pandola, Jr.*
215-568-5010

February 6, 2021

City of Philadelphia
Law Department – Civil Rights Litigation Unit
Civil Rights Unit - One Parkway
1515 Arch Street, Fourteenth Floor
Philadelphia, Penna.  19102
**Attention: Ms. Jacqueline Crowell**

|  |  |
|---|---|
| **Re: Our Client:** | **Michael Joseph Bockius, Deceased** |
| **Date of Arrest:** | **1/5/21** |
| **Date of Death:** | **1/6/21** |
| **Location:** | **35th Police Station** |
| | **5960 N. Broad Street** |
| | **Philadelphia, Pa.** |

Dear Ms. Crowell:

Kindly be advised that we have been retained to represent the Estate of Michael J. Bockius, Deceased in a wrongful death action which occurred while detained at the 35th Police District on the above dates.

Please establish a claim file and correspond with me directly in writing.  I understand that you will advise me of any additional information requirements that you need to fully set up the claim file and investigate this claim.

At this time our firm is requesting that you preserve all physical evidence in your possession, including but not limited to photographs, videotape surveillance, incident/accident reports, and employee statements.  Any destruction of the videotape surveillance will result in a spoliation claim against the City.

The above information is essential to the termination of responsibility and therefore incumbent upon you to maintain same during the course of our investigation.



ABRAMSON & DENENBERG, P.C.
July 6, 2023
Page 2

We would also request an opportunity to examine any of the above information.  If you require any information from our firm to assist you in your investigation, please feel free to contact the undersigned.

I thank you for your anticipated cooperation in this regard.

Very truly yours,

Alan E. Denenberg

AED/mvf
*First Class Mail and*
*Certified Mail #: 7019 2280 0000 2153 4930*

**EXHIBIT "C"**

**Ken Chotiner**

| | |
|---|---|
| **From:** | Derek Kane <Derek.Kane@Phila.gov> |
| **Sent:** | Wednesday, April 26, 2023 9:33 PM |
| **To:** | Kenneth Chotiner |
| **Subject:** | Bockius/Meighan - City Defendants IDs |
| **Attachments:** | Bockius  - City's Initial Disclosure.pdf; Meighan - City Defendants ID Production.pdf |

Hey Ken,

See the City Defendant's initial disclosures attached.

Many thanks,

Derek

Derek Kane
Deputy City Solicitor
City of Philadelphia Law Department, Civil Rights Unit
Office Phone: 215-683-5374
derek.kane@phila.gov



**EXHIBIT "D"**

### ABRAMSON & DENENBERG, P.C.
#### Attorneys-at-Law

Thomas Bruno, II*°          *Ext: 103*
David H. Denenberg*▲       *Ext: 105*
Alan E. Denenberg*°         *Ext: 104*
D. Ben van Steenburgh*      *Ext: 102*
L. Kenneth Chotiner*'       *Ext: 116*
Jason E. Parris*            *Ext: 122*
Jonathan Kaminsky°          *Ext: 109*

*1315 Walnut Street*
*Suite 500*
*Philadelphia, PA 19107*
*(215)546-1345*
*Fax: (215) 546-5355*

ADENENBERG@ADLAWFIRM.COM

*www.abramsondenenberg.com*

A Pennsylvania Corporation
registered in New Jersey

Benjamin Abramson (1932–1978)

Simon J. Denenberg (1961-2015)

Of Counsel: Francis T. Flannery*
Armando A. Pandola, Jr.*
215-568-5010

* Member PA Bar
° Member NJ Bar
▲ Member DC Bar
' Member NY Bar

June 20, 2023

**Via Email: derek.kane@phila.gov**
Derek Kane, Esquire
City of Philadelphia Law Department
Civil Rights Unit
One Parkway
1515 Arch Street, 14th Floor
Philadelphia, PA 19102

   **RE:   Diana Meighan, Administratrix of the Estate of Michael Bockius v. City of
           Philadelphia, et al
           Civil Action No.: 22-CV-5138**

Dear Mr. Kane:

I have reviewed the Defendant's Initial Discovery Disclosures provided on April 26, 2023.
Based on the documents provided, I have prepared the enclosed Stipulation to Amend.
Kindly sign and return it to me and I will cause it to be filed with the Court.

Additionally, please supplement the Defendants' Initial Disclosures and provide copies of
the tangible things referred to in the documents you provided including, but not limited to:
The BWC footage from Sgt. Wresinski, P.O. Welton, P.O. Tucker, and P.O. Joseph; Copies of
the Whitepaper and photograph of the ligature; the recording and/or transcription of P.O.
Joseph's 911 call; and, A copy of the cell room logs maintained by the officers in the 35th
police district for all shifts from January 5th, 2021, through January 6th, 2021.

If you have any questions or concerns, please do not hesitate to contact me. Thank you for
your attention to these matters.

Very truly yours,

L. Kenneth Chotiner, LL.M.

LKC/
Encl.



**EXHIBIT "E"**

**Ken Chotiner**

| | |
|---|---|
| **From:** | Derek Kane <Derek.Kane@Phila.gov> |
| **Sent:** | Friday, June 23, 2023 1:02 PM |
| **To:** | 'KChotiner@adlawfirm.com' |
| **Subject:** | RE: Meighan v. COP et al. |

Good Afternoon Ken,

I cannot agree to the joinder of defendants that I do not represent. You have to file a motion with the court.

In terms of your discovery follow ups, I am working on that now. Can you confirm what the "Whitepaper" is that you refer to and where that is in my production?

Thanks,

Derek

Derek Kane
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5374 (direct dial)
(215) 683-5398 (facsimile)
derek.kane@phila.gov



**From:** Ken Chotiner <kchotiner@adlawfirm.com>
**Sent:** Tuesday, June 20, 2023 4:43 PM
**To:** Derek Kane <Derek.Kane@Phila.gov>
**Subject:** Meighan v. COP et al.
**Importance:** High

1

**EXHIBIT "F"**

**Ken Chotiner**

| | |
|---|---|
| **From:** | Derek Kane <Derek.Kane@Phila.gov> |
| **Sent:** | Monday, June 26, 2023 12:19 PM |
| **To:** | 'KChotiner@adlawfirm.com' |
| **Subject:** | RE: Meighan v. COP et al. |

You can file a motion Ken, which I will not oppose, however I may raise SOL etc arguments if I enter for those new defendants.

Understood on the white paper, I should have the documents you have requested this week.

Derek Kane
Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5374 (direct dial)
(215) 683-5398 (facsimile)
derek.kane@phila.gov

**From:** Ken Chotiner <kchotiner@adlawfirm.com>
**Sent:** Monday, June 26, 2023 12:17 PM
**To:** Derek Kane <Derek.Kane@Phila.gov>
**Subject:** RE: Meighan v. COP et al.

**External Email Notice. This email comes from outside of City government. Do not click on links or open attachments unless you recognize the sender.**

Good Morning Derek,

I'm confused. I'm not asking for you to stipulate for anyone you do not represent. The stipulation is between the plaintiff and the current defendants. If you are still unwilling to sign the stipulation, please let me know your clients' position. I'd like to file such a motion as either "joint" or "unopposed." (I only ask because your clients did not produce their Initial Disclosures before the Court's deadline for filing a motion to add additional parties.) Lastly, the "whitepaper" I requested was the one police faxed to the City's ME.

Thank you for your attention to this matter.

Very Truly Yours,

L. Kenneth Chotiner, ll.m.
Abramson & Denenberg, P.C.
1315 Walnut Street, Suite 500
Philadelphia, PA 19107

